IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 7, 2016

**CURTIS STANTON v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 0902061     Chris Craft, Judge**

**No. W2015-01479-CCA-R3-PC  -  Filed July 21, 2016**

The petitioner, Curtis Stanton, appeals the denial of his petition for post-conviction relief, arguing the post-conviction court erred in finding he received effective assistance of counsel. Following our review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which ALAN E. GLENN and ROBERT W. WEDEMEYER, JJ., joined.

Andrew R.E. Plunk, Memphis, Tennessee, for the Defendant-Appellant, Curtis Stanton.

Herbert H. Slatery III, Attorney General and Reporter; Zachary T. Hinkle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Christopher J. Lareau, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**FACTS**

On March 27, 2013, the petitioner was convicted by a Shelby County Criminal Court jury of first degree murder and sentenced to life imprisonment with the possibility of parole. His conviction was affirmed by this Court on direct appeal, and our supreme court denied his application for permission to appeal. *State v. Curtis Stanton*, No. W2012-00568-CCA-R3-CD, 2013 WL 1229538, at *1 (Tenn. Crim. App. March 27, 2013). On direct appeal, this Court recited the following underlying facts:

> At trial, Eddie Cowan, a friend of the victim, testified that he had known the victim for approximately twenty years. He knew the [petitioner] because of his relationship with the victim. Cowan believed they were still

dating in September 2008. Cowan said that one evening a couple of days prior to the victim's death, the [petitioner] came to Cowan's apartment in Wesley Forest, which was across from the victim's apartment. The men sat on the couch, and the [petitioner] told Cowan that he cared for the victim and that "if he can't have her, can't nobody have her." The [petitioner] asked Cowan to walk with him to the victim's apartment, but Cowan refused. Cowan watched the [petitioner] walk across the walkway to the victim's apartment and knock on the door. No one answered the door, and the [petitioner] left. Cowan noticed that the [petitioner] had a knife in his back pocket.

Falanda Coley testified that she was the victim's best friend. The two women had agreed to meet at Club Lucille on the evening of September 12, 2008. Coley arrived at the club around 8:30 p.m., and the victim was already there. Afterward, Coley saw the [petitioner] enter the club. He acted agitated and paced for a while before coming to the table where Coley was sitting; the victim was in the restroom at the time. When the victim returned to the table, the [petitioner] sat in a chair beside her and tried to talk to her. The victim stared straight ahead and did not look at or speak to the [petitioner]. Between 1:30 and 2:00 a.m., the victim stood and told Coley that she was leaving and that she would see her the next day. The [petitioner] left at the same time as the victim. Coley recalled that the [petitioner] was wearing a green and white striped shirt, a green headband, jean shorts, and green and white Nike tennis shoes.

On cross-examination, Coley said that the club was not very large and that approximately forty people were there that night. She recalled that the victim was drinking beer but that the [petitioner] did not drink any alcohol.

Lee White, Coley's husband, testified that on the night of September 12, 2008, he was working at Club Lucille as security and as a disk jockey. White said that the victim and the [petitioner] had previously dated but were not dating at that time. When White arrived at work, the victim was in the club and appeared to be enjoying herself. However, after the [petitioner] arrived, the victim acted as if she no longer wanted to be there. White saw the [petitioner] try to engage the victim in conversation, but the victim sat very still, looked straight ahead, and did not speak. White saw the victim leave between 1:30 and 2:00 a.m., and the [petitioner] left at the same time. However, they did not leave together. The victim told White that she would

see him the following day. She got into her car and drove away, and the victim followed her in his car. White said the [petitioner] was wearing a green headband, a green shirt, blue jean shorts, and green and white tennis shoes.

The victim's son, Laterrance Tidwell, testified that the [petitioner] was the victim's ex-boyfriend and that they had dated approximately one year. Tidwell said that on Friday, September 12, 2008, the victim took Tidwell and his brother for a haircut. When they arrived at the barbershop, the [petitioner] was there getting a haircut. The [petitioner] walked over to Tidwell and asked where they were going after they left the barbershop. Tidwell responded that they would probably go to Westwood to visit his grandmother, Kira Tidwell.

Tidwell stated that when they left the barbershop, the victim and the [petitioner] "ha[d] little words." Tidwell was sitting in the car with the windows rolled up and did not hear what was said. Afterward, they drove to the victim's mother's house in Westwood. When they arrived, the [petitioner]'s car was already there. Tidwell said that after they left Westwood, they returned home.

Tidwell stated that at approximately 9:00 p.m., the victim left to go to the club. She was wearing a "black muscle shirt" and plaid shorts, and she was carrying a purse. Around midnight, the [petitioner] called three times and asked if the victim had "made it in." Tidwell responded no. Tidwell said that after the third call, he went to sleep. The next morning, he looked out the window and saw the victim's car, but she was not inside the apartment. Tidwell went outside and found the victim lying next to the apartment. Her throat had been slit, and she was covered with blood. Tidwell immediately called the police.

Cecilia May Fitch testified that shortly after 3:00 a.m. on the morning of September 13, 2008, she telephoned the [petitioner] and asked him to come to the Betty Boo Club so he could drive her home. The [petitioner] arrived about ten or fifteen minutes later. Fitch lived approximately fifteen minutes away from the club, and, during the drive, the [petitioner] talked about the victim. Fitch said that she did not know who the victim was. When they arrived at Fitch's house, the [petitioner] came in and stayed five or ten minutes. The following day, the [petitioner] left a voice message for Fitch, asking her to tell anyone who contacted her

-3-

that he had been with her all night.

Memphis Police Officer Essica Cage-Littlejohn testified that on September 13, 2008, she reported to the Wesley Forest Apartments following a missing person's report. When she arrived, a teenage boy, Tidwell, approached her and said that his mother was dead and was lying behind the building. She removed Tidwell from the area and began gathering information for her report.

On cross-examination, Officer Cage-Littlejohn said that she did not see any indication that the body had been dragged. However, she explained that she did not specifically look for drag marks.

Memphis Police Sergeant Vivian Murray testified that the [petitioner] called the police to turn himself in and that officers brought him to the police station. After he arrived, Sergeant Murray interviewed him. Before the interview, she advised the [petitioner] of his *Miranda* rights, and the [petitioner] signed a waiver of rights form with the name "Curtis Greer." She ensured that the [petitioner] could read by having him read the waiver form aloud. Sergeant Murray said that the [petitioner] never said that he did not want to talk or that he wanted an attorney. Sergeant Murray noticed nothing unusual about the [petitioner]'s demeanor, noting that he did not seem intoxicated or give an indication that he did not understand anything. The [petitioner] never mentioned having any psychological issues.

After the [petitioner] agreed to give the statement, he said that the victim's sister had introduced him to the victim. Although the victim was married to Lataurus Peppers, the [petitioner] and the victim dated intermittently for approximately two years. The [petitioner] said that he had a good relationship with the victim's three children. At the time of the offense, the victim had ended their relationship because the [petitioner] was unemployed and because his mother and the victim did not get along.

The [petitioner] said that between 11:00 a.m. and 12:00 p.m. on Friday, September 12, 2008, he called the victim to ask if she was going to Club Lucille's that night. The victim said no. Around 8:00 p.m., the [petitioner] called the victim's house and asked her son where the victim was. After the call, the [petitioner] assumed the victim was at the club. He drove to the club, saw the victim's white 2000 Mitsubishi Mirage in the

parking lot, and returned home to change clothes. He put on blue shorts with a brown deer and green designs on the back, a green t-shirt followed by a white t-shirt with skulls on it, a green NBA headband, and green and white Nike tennis shoes.

The [petitioner] said that he returned to the club at approximately 11:00 p.m. The victim was at the club and was wearing a plaid skirt, a black shirt, and flip flops. The victim asked why the [petitioner] was there, and he responded that it was "a free country." The [petitioner] said that he thought the victim "had a little attitude." He asked the victim to dance, and she refused. The [petitioner] said, "That's when I first started hearing voices in my head telling me to kill her. I guess it just stuck with me." The [petitioner] said that he sat and talked with the victim and Coley. At approximately 1:15 a.m., the victim started feeling "a little drunk," and she and the [petitioner] walked out to the parking lot. The [petitioner] offered to follow the victim home, but she refused. The [petitioner] said, "I trailed her home anyway."

The [petitioner] said that when they arrived at the victim's residence, he parked beside her car. He said that he habitually carried a kitchen steak knife in the pocket of his car door and that he took the knife from the door and put it in the front of his pants. When the victim got out of her car and walked toward her residence, he followed her and asked her to talk with him. She responded that she needed to use the restroom. The [petitioner] said, "Then, the demons took possession, so I grabbed her with both hands and drug her around behind the apartment." He threw the victim on the ground, straddled her, and stabbed her in the throat. The victim reached for the knife, scratched the [petitioner]'s face, and tried to grab his headband. The [petitioner] said that he stabbed the victim four or five times in the face, chest, and stomach. When the victim stopped moving and appeared to be dead, the [petitioner] grabbed her purse from the grass, got into his car, and left.

The [petitioner] said that after he left, he went to the Wolf River on Bellevue and Chelsea where he discarded the victim's purse, his shirt, his headband, and the knife. He went home, washed off the blood, and went to Club Hughes on Firestone to pick up a girl named Cee Cee. He took Cee Cee to her house and stayed for about fifteen minutes. The [petitioner] left, got gas for his car, and went home. When he arrived, his mother told him that the victim's children had called at approximately 4:25 a.m. Around

-5-

6:00 or 6:30 a.m., the [petitioner] called the victim's children and asked if the victim had gotten home. At approximately 7:00 a.m., Peppers called the [petitioner] to say that the victim was dead. The [petitioner] asked what happened, and Peppers responded, "[Y]ou know," and hung up on the [petitioner]. The [petitioner] repeatedly tried to call the victim's house, but each time, the person who answered the telephone hung up. Thereafter, the [petitioner] decided to turn himself in to the police.

Sergeant Murray stated that she and the [petitioner] had conversed for about five hours prior to the statement. During the conversation, the [petitioner] initially denied any involvement in the victim's death and tried to establish that he was elsewhere. Sergeant Murray said that the first time the [petitioner] mentioned demons or hearing voices was during the statement.

On cross-examination, Sergeant Murray stated that the [petitioner] had called police dispatch to turn himself in and that officers met him at his location to bring him into the station. She said the interview with the [petitioner] took place in the interview room at the homicide bureau. She said it was a large room with no windows. The [petitioner] was not handcuffed, but he was wearing a leg iron that was attached to the bench where he was sitting. The [petitioner] did not ask for an attorney and was pleasant, calm, and courteous during the interview. Sergeant Murray said that the crime was committed in the early morning hours and that the [petitioner] turned himself in around 3:00 p.m. the same day.

Lieutenant Bart Ragland testified that he and Sergeant Davison went to a heavily wooded area around Levy Road near Interstate 240 and found the victim's brown purse, including some of its contents; a knife believed to be the murder weapon; and a green NBA headband that matched the description of the one the [petitioner] said he was wearing on the night of September 12, 2008. Lieutenant Ragland said that white medical tape was wrapped around the knife and that there were initials on the handle.

On cross-examination, Lieutenant Ragland acknowledged that he went to the area because the [petitioner] told the police where the evidence could be found. Lieutenant Ragland said that the purse was located at least twenty or thirty yards from the road. He recalled the initials "TVL" being on the knife.

Memphis Police Officer James K. Smith testified that on September 13, 2008, Lieutenant Ragland called him to work as a crime scene officer at Levy and Interstate 240. He said that he collected a purse, a green NBA headband, and a knife with tape around the handle. Officer Smith said that the area had thick vegetation, including green vines and weeds. He recalled that the purse and the headband were found fairly close to each other and that the knife was found several feet away.

Dr. Lisa Funte, a medical examiner with the Shelby County Regional Forensics Center, testified that she performed an autopsy on the victim. She said that the victim's death was caused by multiple sharp force injuries. Dr. Funte stated that the victim suffered ten stab wounds and a minimum of thirty-five incised wounds. The wounds were on the victim's face, neck, shoulders, chest, arms, hands, and legs. Dr. Funte specifically noted that the victim had been stabbed in her left cheek and her nose, "breaking the bones of the nasal cavity and the face." She said the wound would have been quite painful. The victim had defensive wounds to her hands and forearms. Dr. Funte noticed that the incised wounds on the upper left chest had a pattern that was characteristic of wounds made with a serrated blade. She also found multiple blunt force injuries and indications of manual strangulation. Dr. Funte found two potentially fatal wounds. Specifically, there was a stab wound to the left of the victim's neck, which cut the left carotid artery, caused profuse bleeding, and would have led to the victim's death within a few minutes. There was also a stab wound to the right side of the victim's chest, which penetrated the chest wall, diaphragm, and liver. Dr. Funte noted that there was little hemorrhaging at the site of the liver stab wound, which indicated a loss of blood pressure at the time the wound was inflicted. Because of the lack of blood pressure at the time the liver was stabbed, Dr. Funte opined that the carotid artery was stabbed first.

After the State rested its case-in-chief, Dr. Joseph Charles Angelillo, a clinical and forensic psychologist, testified as a defense witness. He said that he met with the [petitioner] on five occasions in 2010, spending three and a half hours interviewing and nine to ten hours testing him. Dr. Angelillo saw no evidence that [petitioner] was malingering. As a result of the tests, Dr. Angelillo determined that the [petitioner], who had an IQ of 65, suffered from "very significant anxiety" and that, under stress, the anxiety would bring on confusion, lack of organization, and "border[ ] on if not reach[ ] delusional thinking." He also found the [petitioner] had

-7-

symptoms of post-traumatic stress disorder (PTSD), but he could not say that the PTSD preexisted the killing.

Dr. Angelillo said that at first, the [petitioner] did not understand why he was being evaluated. During the evaluation process, the [petitioner] was cooperative, friendly, and receptive. The [petitioner] gave his account of the events in a coherent and calm manner. Dr. Angelillo estimated that the [petitioner] functioned at a level between the first and fifth grades. He said that the [petitioner]'s cognitive abilities did not affect his ability to tell the truth or to lie. He stated that none of the [petitioner]'s mental or psychological problems would make him behave impulsively. Dr. Angelillo said, "[I]t doesn't take much for him to go from a low point of stress and controlled behavior to disorganized thinking and in fact at those times, he may be much more prone to act without giving it much thought." Therefore, he opined that the [petitioner] was incapable of premeditating. He said, however, that the [petitioner] was able to tell the difference between right and wrong and knew that what he was doing was wrong when he killed the victim.

On cross-examination, Dr. Angelillo conceded that the [petitioner] had no history of mental health issues or treatment. The [petitioner] told Dr. Angelillo that he heard voices on only one occasion, which was just prior to killing the victim. The [petitioner] had held a number of different jobs and attended high school until the eleventh grade.

Dr. Angelillo said that the [petitioner]'s PTSD could have been triggered by killing the victim. He acknowledged that "even an elementary school child can form a plan of action." Dr. Angelillo concluded that the [petitioner] felt rejected, angry, and helpless and that his actions toward the victim were a result of his attempt to regain the relationship or to regain the appearance of control. Dr. Angelillo acknowledged that in his report he wrote, "[W]hat in my opinion appears to be the most important is the purpose that appeared to be served, that is this purpose appeared to create or at least solidify a previously thought of plan of action."

On redirect examination, Dr. Angelillo said that the [petitioner] had "symptoms that satisfied the diagnosis [of generalized anxiety disorder] on a rule out basis. And I stress rule out." He said that generalized anxiety disorder alone would not necessarily render someone incapable of premeditation but that, "along with other things," the diagnosis led him to

conclude that the [petitioner] was incapable of premeditation.

Dr. Angelillo acknowledged the [petitioner] said that a demon took hold of him and that he heard voices telling him to kill the victim. However, Dr. Angelillo said that he did not think the [petitioner] was suffering from a hallucination or that the [petitioner] "literally [heard] a voice saying do this." Instead, the [petitioner] likely had a thought that repeated itself until it may have become an obsession.

On recross examination, Dr. Angelillo said that the [petitioner] heard a voice once but that "this group of thoughts was not just a one-time deal." He explained that the group of thoughts could have originated from the [petitioner]'s idea that he could not live without the victim.

The jury convicted the [petitioner] of first degree premeditated murder, and the trial court sentenced the [petitioner] to life imprisonment with the possibility of parole. On appeal, the [petitioner] challenges the sufficiency of the evidence sustaining his conviction.

*Curtis Stanton*, 2013 WL 1229538, at *1-6.

On January 28, 2014, the petitioner filed a *pro se* petition for post-conviction relief. Following the appointment of counsel, two amended petitions were filed. In the petitions, the petitioner raised, among other allegations, ineffective assistance of counsel due to a deficient explanation as to the effect of testifying.

The post-conviction court conducted an evidentiary hearing on June 4, 2015. The petitioner testified that prior to the start of trial, he and his attorney never discussed the possibility that he would testify at trial. Before the trial ended, however, the petitioner's lawyer called him to the stand, and he was asked a series of questions about the implications of testifying. The petitioner's trial counsel also testified. He stated that prior to trial, he and the petitioner discussed the possibility that he would testify at least four or five times, and the petitioner decided he did not want to testify. Counsel for the petitioner also argued that due to the petitioner's intellectual issues, trial counsel should have explained the petitioner's right to testify in greater detail. The post-conviction court then took the matter under advisement in order to review the *Momon* transcript.

On July 10, 2015, the post-conviction court entered a detailed order denying post-conviction relief on the basis that the petitioner failed to meet either the deficiency or prejudice prong of the *Strickland* test for ineffective assistance of counsel. In denying the

petition, the post-conviction court resolved the conflicting testimony "by finding the trial attorney credible and the petitioner untruthful." With respect to the petitioner's contention that he may have testified had trial counsel explained his right to do so in greater detail, the post-conviction court found it significant that the petitioner failed to state what his testimony would have been had he testified, further noting that "[i]t would be hard for this court to envision any testimony by the petitioner that would explain away the facts produced at trial and negate premeditation." This appeal followed.

## ANALYSIS

On appeal, the petitioner argues that trial counsel provided ineffective assistance by failing to adequately explain his right to testify. The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. *See* Tenn. Code Ann. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. *See Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. *See Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is de novo, with no presumption of correctness. *See Ruff v. State*, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed de novo, with a presumption of correctness given only to the post-conviction court's findings of fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001); *Burns v. State*, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. *Strickland v. Washington,* 466 U.S. 668, 687 (1984); *see State v. Taylor,* 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the same standard for determining ineffective assistance of counsel applied in federal cases also applies in Tennessee). The *Strickland* standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

-10-

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad v. State,* 938 S.W.2d 363, 369 (Tenn.1996) (citing *Strickland,* 466 U.S. at 688; *Baxter v. Rose,* 523 S.W.2d 930, 936 (Tenn.1975)). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694.

Courts need not approach the *Strickland* test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; *see also Goad,* 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

The post-conviction court found the petitioner did not prove either *Strickland* prong by clear and convincing evidence. In denying the petition, the post-conviction court first resolved the conflicting testimony by finding the trial attorney credible and the petitioner untruthful and then elaborated:

> [The petitioner's] attorney did everything he could to keep from having the petitioner convicted as charged, was fully aware of the petitioner's low IQ and took pains to explain everything to the petitioner numerous times, including whether or not he wished to testify. It is significant to this court that the petitioner did not give any offer of proof at the hearing on this petition as to what his testimony might have been, and so no prejudice can be shown. It would be hard for this court to envision any testimony by the petitioner that would explain away the facts produced at trial and negate premeditation … [t]his court finds that the petitioner has not proven either *Strickland* prong. He has not shown that his attorney's performance was deficient and has put on no proof of prejudice.

We conclude the record supports the post-conviction court's finding that the petitioner failed to meet his burden of proving ineffective representation. During the post-conviction hearing, trial counsel testified that he met with the petitioner multiple times prior to trial to discuss the implications of testifying, and the petitioner did not wish to testify. Further, during the *Momon* hearing, the petitioner testified that he understood his

-11-

rights, and it was his decision not to testify. The petitioner has failed to show that trial counsel was deficient in his representation.

The petitioner has also failed to show that trial counsel's performance prejudiced the outcome of the proceeding. The petitioner failed to offer any evidence as to what his testimony would have been had he been called to testify. In the absence of such proof, the petitioner cannot demonstrate prejudice. *See Leach v. State*, No. W2004-01702-CCA-R3-PC, 2005 WL 1651654, at *8 (Tenn. Crim. App. July 14, 2005), *perm. app. denied* (Tenn. Dec. 5, 2005) (finding a *Momon* violation but holding that the "details of [the petitioner's] potential testimony, however, are lacking" so he failed to demonstrate prejudice). We conclude, therefore, that the petitioner is not entitled to post-conviction relief on the basis of his claim of ineffective assistance of counsel.

## CONCLUSION

Based upon the foregoing authorities and reasoning, the judgment of the post-conviction court is affirmed.

_____
J. ROSS DYER, JUDGE

-12-